Appeal of **NEUSE MANUFACTURING CO.**     Docket No. 922.

Evidence *held* insufficient to support appeal.

Submitted January 28, 1925; decided March 16, 1925.

*Edward S. Parker, Jr., Esq.*, and *G. S. Alexander, C. P. A.*, for the taxpayer.

*Benjamin H. Saunders, Esq.*, for the Commissioner.

Before JAMES, STERNHAGEN, and TRAMMELL.

This appeal, involving income and profits taxes for the fiscal years ending in 1918, 1919, and 1920, is based upon several allega-

tions of error. All the evidence is contained in the oral testimony of a single witness, and the findings of fact are necessarily such as are disclosed by this evidence.

### FINDINGS OF FACT.

The taxpayer is a corporation, organized early in 1912 to conduct the business of a cotton mill theretofore owned and operated by another corporation called the Neuse River Mills. The earlier business was apparently begun some time about 1900 and was capitalized at $125,000 of common stock and $75,000 of bonds. J. W. Hardin owned 47 shares of the stock and all of the bonds. He acquired his last 12 of the bonds shortly prior to the transfer of the business in 1912, and in all probability bought them for 50 per cent of their face value. This was their market price at that time. For two years prior to 1912 the mill and its machinery were idle. One Riddich, who in some way became the president *pro tem* of the corporation and a member of its board of directors, suggested to all of the stockholders of the old corporation a reorganization and asked them to participate. All but about four of the old stockholders did so, the participating stockholders being the owners of approximately $113,-000 of stock in the old corporation. Hardin and Andrews were the principal financial promoters of the reorganization, although they were not experienced in the cotton-mill business. The method of reorganization adopted was that the business of the old corporation was placed with a receiver appointed by the court and a public receiver's sale was conducted. Hardin, being the sole bondholder, purchased the property at this sale for $53,000 and arranged with the witness, an experienced cotton-mill operator, to operate the mill. Nineteen thousand dollars was also put into the new corporation and used for operation. The new corporation's assets were $72,000. Two or three of the new stockholders had not been stockholders in the old corporation.

The witness, who had been in touch with the cotton-mill business since 1881 and directly engaged therein since 1902, examined the property when he became associated with it in 1912 and arrived at a valuation of $280,000, being 8,000 spindles at $35 a spindle. The cost of the plant to the old company appeared to be about $234,000, but the witness's valuation was made without knowledge of this original cost. The witness included in his valuation machinery, mill buildings, tenements, land, and water-power development, including a 400-foot stone dam. The building was a three-story stone building and there were 27 standard small frame construction tenements.

In October, 1920, two persons made an appraisal of what the plant was worth in 1912 and, in the language of the witness, they found the value to be "something like $294,000, less depreciation of a total—the net value was $243,000, something like that." Another person appraised the buildings at $130,000 in round numbers, and another at $138,000. An insurance company insured the mill building and machinery at $150,000 and offered to write $200,000.

Up to 1918 the company had been manufacturing sheets of white gray drilling weighing 4¼ ounces to the yard, or 3.75 yards to the pound. In 1918 they tried to make a lighter product. Labor condi-

tions were bad and the help was untrained and the output was inferior. The mill was operated overtime in 1918, 84 per cent; 1919, 47 per cent; 1920, 80 per cent. The ordinary life of the machinery was 20 years. Some of the original machinery was still in operation in 1925 and some has been replaced. The witness was unable to state the extent to which overtime operation resulted in accelerating depreciation. A rate of 5 per cent for depreciation is a normally sufficient rate. In 1918 the mill operated 332 days; 1919, 307 days; and 1920, 333 days. Since 1912 there have been some additions in the machinery account.

The Commissioner, after hearing the taxpayer, determined a deficiency for the three years in question of $31,605.20, as follows: 1918, $10,039.73; 1919, $14,083.08; and 1920, $7,482.39.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

STERNHAGEN: The taxpayer asserts that the Commissioner's determination is erroneous for several reasons. It alleges that the present taxpayer is the successor by reorganization of the corporation which operated the business prior to 1912, and that hence the invested capital to be used as the basis of its profits tax must be the invested capital of the old corporation. It will readily be seen that the evidence will not support such a conclusion. There is nothing in the evidence except the few statements of the witness who began to operate the mill in 1912, knowing nothing about it prior to that time. It is apparently true that Hardin, the sole bondholder of the old corporation, bought the property in for $53,000 and added $19,000 in cash. The amount of stock or how it was distributed and held does not appear, except that this witness knew that the holders of $113,000 of the old stock came into the new corporation. He also said that there were some new stockholders and that some of the old stockholders dropped out. This is scarcely enough to support the contention that we should completely disregard the fact that there were two separate corporations and an intervening receivership with a public sale. It may, as a matter of fact, be true that the second corporation is different from the first only in name and legal existence, but this we can not infer.

As to depreciation, the witness testified that 5 per cent was a sufficient rate for normal production. He did not believe it to be sufficient for overtime production but was unable to estimate the extent of the increase. The Commissioner has allowed an augmentation of 50 per cent, bringing the rate to 7½ per cent, and we can not say that this should be increased. Upon the evidence it must be approved. Some question was raised as to the value of plant in 1912. The evidence again is entirely unconvincing as to any value. The statements of the witness that someone else in 1920 had valued the property as of 1912 is of negligible weight. The appraisers themselves were not offered for examination and the basis for the alleged valuation is not disclosed. The witness's own valuation of $35 a

spindle is likewise not sufficiently supported to justify its adoption. We are compelled to conclude in the state of the record that the taxpayer has failed to sustain any of its assignments of error.